# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The residence located at 478 Allenby Drive, Marysville,<br>Ohio 43040 | )<br>)<br>)<br>)<br>)<br>) |

Case No.   2:23-mj-201

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See attachment A to the Affidavit in Support of the Search Warrant Application, incorporated herein by reference.

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B to the Affidavit in Support of the Search Warrant Application, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. § 922(g)(1) | -Felon In Possession of a Firearm |
| Title 21 U.S.C. § 841(a)(1) | -Distribution of a Controlled Substance |

The application is based on these facts:

See Affidavit in Support of this Application, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Matthew J. Voytek IV*
*Applicant's signature*

Matthew J. Voytek IV, Special Agent #6591
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   March 28, 2023

City and state:   Columbus, Ohio

Kimberly A. Jolson
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF THE RESIDENCE LOCATED AT 478 ALLENBY DRIVE, MARYSVILLE, OHIO 43040** | **CASE NO.**  2:23-mj-201 <br><br> **FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Matthew J. Voytek, a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being duly sworn, depose and state the following:

### I. INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a warrant under Rule 41 of the Federal Rules of Criminal Procedure to search the residence located at 478 Allenby Drive, Marysville, Ohio (the "**SUBJECT PREMISES**"), as further described in Attachment A, and to seize the items described in Attachment B.

2.       I am a Special Agent with the ATF and have been so employed since January 2021.  I have attended formal training at the Federal Law Enforcement Training Center in Glynco, Georgia, where I completed the Criminal Investigator Training Program.  I also attended the ATF National Academy in Glynco, Georgia, where I completed Special Agent Basic Training.  I have received training in the enforcement of various criminal statutes enacted in the Gun Control Act of 1968 and the National Firearms Act of 1932.  I am presently assigned as a Special Agent for the ATF Columbus Field Division, Columbus Group I Field Office.  Under 18 U.S.C. § 3051, I am empowered to enforce the criminal laws of the United States.

3.     As a Special Agent, I have participated in many investigations involving federal firearms violations, narcotics trafficking, and money laundering. Through these investigations, I have employed various investigative techniques, including conducting electronic surveillance, using confidential informants, and making controlled purchases of firearms and narcotics.  I have also participated in conducting physical surveillance and have executed multiple federal arrest warrants.  I also know how to analyze information resulting from traditional record searches and reviewing case files. I have reviewed financial records and have identified financial frauds. As a result of my training and experience, I am familiar with federal laws pertaining to narcotics trafficking, and money laundering and conspiracies to commit an offense against the United States, among other crimes.

4.     I have personally participated in the investigation set forth below.  I am familiar with the facts and circumstances of the investigation through my personal participation; from discussions with other ATF agents and other law-enforcement officers; and from my review of records and reports relating to the investigation.  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another special agent, law-enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed.  Throughout this affidavit, reference to "investigators" specifically refers to criminal investigators.

5.     This affidavit is intended to show that there is sufficient probable cause for the above-described search warrant and does not purport to set forth all my knowledge of, or investigation into, this matter.  The facts and information contained in this affidavit are based

on my personal knowledge, my training and experience, my interviews of various witnesses, including law-enforcement personnel who participated in this investigation, and my review of certain records and documents.

## II. APPLICABLE STATUTES AND DEFINITIONS

6. Title 18, United States Code, Section 922(g)(1) makes it a federal crime for a person to knowingly possession a firearm after being convicted of a crime punishable by imprisonment for a term exceeding one year.

7. Title 21, United States Code, Section 841 makes it a federal crime for any person to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense a controlled substance. Subsection (b) of this section makes cocaine, cocaine base, heroin, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly referred to as fentanyl, and any of their isomers controlled substances.

## III. BACKGROUND REGARDING ACTIVITIES OF DRUG TRAFFICKERS

8. Your affiant has learned through training and experience the ways in which narcotics traffickers conduct their business, including methods of distributing narcotics, the use of home-based telephones and the use of cellular telephones, and the use of vehicles to facilitate their illegal activities. Your affiant's training and experience as an ATF Special Agent form the basis of the opinions and conclusions set forth below.

9. In my training and experience, narcotics traffickers often place assets in names other than their own and/or use fictitious identification to avoid detection of these assets by government agencies or local law enforcement.

10. In my training and experience, that even though these assets are in other persons' names the narcotics traffickers continue to exercise dominion and control.

11.     In my training and experience, that it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, bus tickets, rental car receipts, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, purchasing, processing, storage, sale and distribution of drugs, and the collection of its proceeds.  That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the narcotics traffickers have ready access to them.

12.     In my training and experience, that it is common for narcotics traffickers to secrete contraband, proceeds of drug sales, records of drug transactions, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value; and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money made from engaging in narcotics trafficking activities in secure locations within their residences and/or other locations over which they maintain dominion and control, in order to have ready access to them.

13.     In my training and experience, I know it is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of narcotic proceeds, such as: currency, financial instruments, precious metals and gem stones, jewelry, books, records, invoices, receipts records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, loan records, money orders, bank drafts, cashier checks, bank checks, wire transfers, safe deposit box keys and money wrappers.  These items are maintained by the narcotics traffickers within their residences and/or other locations which they maintain dominion and control.

14.     In my training and experience, I know when drug traffickers amass a large amount of proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits.

15.     In my training and experience, I know to accomplish these goals, narcotics traffickers utilize, including, but not limited to, foreign and domestic banks and their attendant services, Western Union and other wire transfer or Money Service Businesses sales agents, check cashing services, real estate agents, securities brokers, accountants, attorneys, business fronts, and otherwise legitimate businesses which generate large quantities of currency.

16.      In my training and experience, I know that the sale of controlled dangerous substances, generates large quantities of United States currency (aka, street money.)

17.     In my training and experience, that it is common for drug dealers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting.

18.     Through my training and experience, that the Currency Transaction Report (CTR - IRS Form 4789), which is required to be completed and filed with the Internal Revenue Service by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution(s).

19.     In my training and experience, that in order to evade the filing of a Currency Transaction Report (CTR), narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency.

20.      In my training and experience, that narcotics traffickers commonly maintain addresses or telephone numbers in books or papers, which reflect names, addresses and/or

telephone numbers of their suppliers, customers, and other associates involved in their narcotics trafficking organization.

21.     In my training and experience, drug traffickers commonly have in their possession, that is on their person, at their residences and/or other locations over which they maintain dominion and control, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. Said firearms are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to: narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency; and that courts have recognized unexplained wealth is probative evidence of crimes, in particular, trafficking in narcotics.

## IV. PROBABLE CAUSE FOR THIS SEARCH

22.     As set forth throughout this affidavit, I submit there is probable cause to believe that violations of 21 U.S.C. § 84l (a)(l) (distribution and possession with intent to distribute controlled substances) and 18 U.S.C. §§ 922(g)(l) and 924(a)(2) (felon in possession of a firearm) [collectively, the "**TARGET OFFENSES**"] have been committed, are being committed, and will continue to be committed by Michael BERRY and other individuals both known and unknown. Furthermore, I submit there is probable cause to search the **SUBJECT PREMISES** for evidence of those crimes; contraband, fruits of those crimes, or other items illegally possessed; and property designed for use, intended for use, or used in committing those crimes.

23.     This Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 US.C. § 2711. Specifically, the Court is a district court

of the United States that has jurisdiction over the controlled-substance and firearm offenses being investigated. See 18 U.S.C. § 2711(3)(A)(i).

24.    In April of 2022, ATF Confidential Informant #27416 advised investigators that an armed drug trafficker named Michael BERRY, reached out to him /her to purchase narcotics from BERRY. As a result, the ATF Columbus Field Office commenced an investigation into Michael A. BERRY, a documented Milo Blood gang member and convicted felon. Your affiant has since caused a query of the Franklin County Common Pleas Clerk of Court Website and found that BERRY has been convicted of the following felonies:

| Case # | Charge |
| --- | --- |
| 06CR001515 | F1 Aggravated Robbery |
| 13CR005898 | F3 Weapons Under Disability |
| 11CR005382 | F4 Receiving Stolen Property |

25.    Between the dates of April 21, 2022, and April 23, 2022, BERRY corresponded with an ATF Special Agent working in an undercover capacity ("ATF UCA") regarding the sale of fentanyl. Over the course of the conversations with BERRY in both text and conversation formats BERRY informed the ATF UCA he only deals in larger quantities of fentanyl. After a few conversations BERRY agreed to sell fentanyl to the ATF UCA.

26.    On April 28, 2022, the ATF UCA attempted to purchase one ounce of fentanyl from BERRY. BERRY advised ATF UCA prior to arriving to the agreed upon location that he would be on his own and not with anyone else and that he was driving a black Dodge Charger. It should be noted that as soon as the ATF UCA arrived to the agreed upon location that the ATF UCA observed BERRY as the front passenger in a black Kia Optima with no license plate. It should be noted the driver was recognized by ATF UCA as a co-suspect of BERRY in an aggravated robbery.

27.     BERRY ultimately changed locations several times and contradicted the pre-agreement made with ATF UCA. It became immediately apparent that BERRY was not planning to follow through on the pre-arranged narcotics deal with the ATF UCA. BERRY and the ATF UCA exchanged several back-and-forth phone calls. It became immediately apparent to the ATF UCA and other ATF personnel that BERRY was displaying signs of nervous and irrationalness that are not consistent with a narcotics transaction. Subsequently the ATF UCA terminated the operation with BERRY. Your affiant knows through training and experience that counter surveillance conducted by BERRY, to include arriving in a different vehicle with another individual that was not originally agreed upon, along with the other aforementioned facts, are indicators of a possible narcotics-based robbery.

28.     Your affiant knows through training and experience that often times narcotics traffickers will also engage in the business of narcotics-based transaction robberies when afforded the opportunity. Your Affiant knows through training and experience that long travel patterns followed by a stop of brief duration at the destination followed immediately by a long travel pattern back to the original departure point is movement consistent with criminal activity such as narcotics and/or firearms trafficking.

29.     On or about May 10, 2022, your affiant secured a federal search and seizure warrant, Case No. 2:22-mj-322, relevant to E911 GPS Data of (614) 558-6670 (AT&T), which has been utilized by BERRY.

30.     On or about May 16, 2022, ATF investigators were monitoring the pen register and GPS pings for a cell phone being used by BERRY. ATF investigators observed that the phone had been consistently pinging in the Elmwood Villas neighborhood area of Marysville, Ohio starting on 5/12/22, in the evening, night and early morning hours.

31.     On or about May 16, 2022, Task Force Officer (TFO) Joshua Wright contacted Marysville Police Department and acquired a Marysville police report pertaining to a domestic dispute between a Tanesha Nashae GOODMAN (DOB: 5/22/1992) and Michael BERRY, at address 478 Allenby Drive, Marysville, Ohio 43040.

32.     On or about May 16, 2022, at approximately 6:15 pm ATF investigators traveled to the area of 478 Allenby Drive Marysville, Ohio to conduct physical surveillance for the purpose to attempt to identify BERRY at that residence. It should be noted that during this period of time technical surveillance regarding BERRY was still active and being monitored by ATF investigators.

33.     At approximately 7:22 pm, TFO Wright observed a white 2021 Mercedes, GLA bearing Ohio registration JJV4774, parked in the driveway of 478 Allenby Drive, Marysville, Ohio 43040.The vehicle is registered to Tanesha GOODMAN and shows an address of 478 Allenby Drive, Marysville, Ohio 43040.  It should be noted that prior to this occasion, ATF Intelligence identified GOODMAN as a frequent contact of BERRY at (614) 678-1513.

34.     At approximately 7:22 pm, TFO Wright also observed BERRY exit the front door of residence 478 Allenby Drive, Marysville, Ohio 43040 and pick up what TFO Wright suspected was mobile food delivery and enter back into the residence via the front door.

35.     At approximately 7:23 pm TFO Wright observed BERRY and GOODMAN exit the 478 Allenby Drive, Marysville, Ohio 43040 residence and enter into the aforementioned white Mercedes. GOODMAN entered into the driver side seat and BERRY entered into the front passenger seat. The vehicle then exited the complex and physical surveillance was terminated at approximately 7:40 pm.

## V. FRADULANT FINANCIAL ACTIVITY

36.     During the course of this investigation your affiant obtained financial information

through Grand Jury Subpoenas relating to Michael BERRY and Tanesha GOODMAN listed

below:

37.     On or about September 26, 2018, Tanesha GOODMAN filed Domestic For-Profit

LLC-Articles of Organization paperwork with the Ohio Secretary of State's office for a business

named MINKED BY NEESH LLC.  On or about January 6, 2021 at approximately 4:48 p.m.

Tanesha GOODMAN applied for an Economic Injury Disaster Loan with the Small Business

Administration under this entity listing $92,386 as the Gross Revenues for the twelve (12)

months prior to the date of the disaster (January 31, 2020) and $27,881.00 as the cost of goods

sold for the twelve (12) months prior to the date of the disaster (January 31, 2020) electronically

utilizing IP address 2603:6011:8406:5a00:4d6:9f70:64b9:627c to submit the application  in the

amount of $20,000.

38.     This is a low interest loan directly from the Small Business Administration (SBA)

to help overcome the effects of the pandemic by providing working capital to meet operating

expenses including payroll, rent/mortgage, utilities, and other ordinary business expenses, and to

pay business debt incurred at any time, (past, present, or future.) On GOODMAN's SBA

application overview, GOODMAN listed the MINKED BY NEESH LLC full business address

as 586 Meadow Drive Marysville, Ohio 43040.  This loan was funded by the SBA on or about

January 13, 2021.  These funds were deposited into GOODMAN'S MINKED BY NEESH LLC.

Wright Patt Credit Union account # 8146458 ID 90 which GOODMAN opened on or about

January 6, 2021, at 2:25 p.m. (approximately 2 hours and 23 minutes before GOODMAN

submitted her SBA loan application) as the sole account owner listing Michael Berry as an

authorized signer on the account. When opening the Wright Patt account, GOODMAN listed the address 478 Allenby Drive, Marysville, Ohio 43040 for MINKED BY NEESH LLC. Your Affiant found that the provided gross revenue and cost of goods sold figures on GOODMAN'S SBA loan application were not consistent with her State of Ohio tax filings.

39.     Below are the funds that were first withdrawn from GOODMAN'S Wright Patt Credit Union bank account, when the initial Economic Injury Disaster Loan deposit of $20,000 was placed into GOODMANS account, relating to the applied purpose of these funds the following occurred:

01/14/2021 $4000 cash withdrawal

02/10/2021 $-98.70 Withdrawal PAYPAL *HOTELS.COM

02/11/2021 -6.44 WithdrawalAPPLE.COM/BILL

02/14/2021 -257.06 Withdrawal PAYPAL *BEAUTY HAIR

02/14/2021 -2.06 Withdrawal Debit Card Fee

03/09/2021 $-5,000.00 Withdrawal Kiosk PTM cash withdrawal

03/18/2021 -85.60 Withdrawal PAYPAL *KIDSFOOTLOC

03/19/2021 -916.00 Withdrawal PAYPAL

03/19/2021 -7.33 Withdrawal Debit Card Fee VISA INTERNATIONAL SERVICE

03/21/2021 -18,526.00 Withdrawal Home Banking Transfer To Share*

* These funds were transferred to Tanesha GOODMAN'S Wright Patt MINKED BY NEESH LLC. business account 8146458 ID 00 with the following disposition:

05/13/2021 $-8,500.00 Withdrawal Kiosk PTM cash withdrawal

05/14/2021 -400.00 Withdrawal Transfer To ID 90

05/18/2021 -200.00 Withdrawal Kiosk PTM cash withdrawal

05/18/2021 -300.00 Withdrawal Kiosk PTM cash withdrawal

05/24/2021 -2,500.00 Withdrawal Kiosk PTM cash withdrawal

05/26/2021 -6,629.12 Withdrawal Home Banking Transfer back to Wright Patt MINKED BY

NEESH LLC. business account 8146458 share 90 with the following disposition:

06/22/2021 $-150.00 Withdrawal Kiosk PTM cash withdrawal

06/22/2021 -2,000.00 Withdrawal Kiosk PTM cash withdrawal

06/22/2021 -160.00 Withdrawal Kiosk PTM cash withdrawal

40.     Your affiant believed probable cause exited that the SBA funds were not utilized

for the Economic Injury Disaster Loan's required purpose and were fraudulently obtained by

Tanesha GOODMAN.

41.     On March 24, 2023, SA Voytek presented United States Magistrate Judge

Chelsey M. Vascura with a federal search warrant for the address of 478 Allenby Drive based

upon the search for any records and or documents related to the fraudulently obtained loan. On

March 24, 2023, United States Magistrate Judge Chelsey M. Vascura found probable cause and

signed the search warrant that was presented by SA Voytek.

### VI. EXECUTION OF FEDERAL SEARCH WARRANT

42.     On March 28, 2023, at approximately 10:00 am, ATF Special Agents, and Task

Force Officers executed a federal search warrant at 478 Allenby Drive, Case No. 2:23-mj-192.

During the execution of the Search Warrant, while looking for documents pertaining to the

Economic Injury Disaster Loan with the Small Business Administration, ATF Agents and Task

Force Officers located  three firearms, and a torn off plastic baggy containing multiple round

blue pills within the residence. Your affiant is aware through training and experience that drug

traffickers often sell and package narcotics in torn off zip lock baggies.  The pills were located

on the closet floor in plain view. The pills were preliminarily identified as Oxycodone

Hydrochloride pills, a scheduled substance that were further identified through Drugs.com   The

firearms were further identified as two shotguns and a handgun. In addition, a drum magazine

and a box of ammunition were located. The handgun was located in plain view, within

GOODMAN's and BERRY's bedroom closet. The two shotguns with the drum magazine were

located underneath GOODMAN and BERRY's bed.

### INTERVIEW OF TANESHA GOODMAN

43.     On March 28, 2023, an interview was conducted with Tanesha GOODMAN

while the search warrant was being conducted. GOODMAN was read her rights and signed the

form that was read to her, acknowledging she understood her rights and agreed with talking to

investigators without a lawyer present. SA Voytek began asking her questions pertaining the

SBA loan she applied for, along with questions pertaining to the firearms that were located with

the residence. GOODMAN stated to ATF Investigators that there were multiple firearms located

within the residence. GOODMAN stated that the pistol that was in the closet was hers, and that

she purchased it from Vance's Outdoors gun store. GOODMAN stated that the shotguns

underneath the bed, she did not own, and that the shotgun's were her boyfriends, Michael

BERRY. SA Voytek asked GOODMAN if BERRY lives at the residence. GOODMAN replied

and said yes. SA Voytek asked how long has Berry lived at the residence, GOODMAN stated

BERRY has lived at the residence for about a year.

### VII.  NEXUS BETWEEN BERRY, SUBJECT PREMISES, AND THE TARGET OFFENSES

44.     ATF Investigators found 478 Allenby Drive, Marysville, Ohio 43040 as the

current residence based upon surveillance conducted at the residence for BERRY.

45.     GPS pings for a cell phone being used by BERRY had been consistently pinging in the Elmwood Villas neighborhood area of Marysville, Ohio starting on 5/12/22, in the evening, night and early morning hours.

46.     On March 22, 2023, ATF investigators spoke to an employee that works at the Elmwood Villas apartment complex where unit 478 Allenby Drive is located. The employee stated they have observed BERRY in and around the residence on multiple occasions.

47.     On March 28, 2023, ATF Investigators conducted surveillance of the residence prior to the execution of the search warrant. At approximately 9:55 am, investigators observed BERRY exit the residence and walk westbound away from the residence.

48.     During the execution of the search warrant, legal documents were located within the bedroom that had Michael BERRY's name and information on it.

49.     Your affiant believes that BERRY is living at 478 Allenby Drive and is likely storing proceeds from his narcotics operation at this location.

## TECHNICAL TERMS

50.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.      IP Address: The Internet Protocol address ( or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 12 I .56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service

14

providers control a range of IP addresses. Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is,

frequently changed-IP addresses.

b.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c.      Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

51.      As described above and in Attachment B, this application seeks permission to search for records that might be found on the Premises, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

52.       I submit that if a computer or storage medium is found on the Premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

53.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a

storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

54.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

55.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

56.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

57.     Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Premises because:

58.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

59.     As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the

computer or storage media was accessed or used.  For example, as described herein, computers

typically contain information that log: computer user account session times and durations,

computer activity associated with user accounts, electronic storage media that connected with the

computer, and the IP addresses through which the computer accessed networks and the internet.

Such information allows investigators to understand the chronological context of computer or

electronic storage media access, use, and events relating to the crime under investigation.

60.     Additionally, some information stored within a computer or electronic storage

media may provide crucial evidence relating to the physical location of other evidence and the

suspect.  For example, images stored on a computer may both show a particular location and

have geolocation information incorporated into its file data.  Such file data typically also

contains information indicating when the file or image was created.  The existence of such image

files, along with external device connection logs, may also indicate the presence of additional

electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).

The geographic and timeline information described herein may either inculpate or exculpate the

computer user.  Last, information stored within a computer may provide relevant insight into the

computer user's state of mind as it relates to the offense under investigation.  For example,

information within the computer may indicate the owner's motive and intent to commit a crime

(e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a

"wiping" program to destroy evidence on the computer or password protecting/encrypting such

evidence in an effort to conceal it from law enforcement).

61.     A person with appropriate familiarity with how a computer works can, after

examining this forensic evidence in its proper context, draw conclusions about how computers

were used, the purpose of their use, who used them, and when.

62.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

63.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

59.     Necessity of seizing or copying entire computers or storage media.  In most cases, a thorough search of a Premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the Premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

64.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a

computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on Premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

65. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

66. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

67. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.

## VIII. CONCLUSION

68.     Based on the foregoing, I believe that there is probable cause to issue a search warrant for the **SUBJECT PREMISES**, more particularly described in Attachment A, and to seize the items described in Attachment B, as those items constitute evidence of the **TARGET OFFENSES**; contraband, fruits of the **TARGET OFFENSES**, or other items illegally possessed; or property designed for use, intended for use, or used in committing the **TARGET OFFENSES**.

Respectfully submitted,

*Matthew J. Voytek IV*

Matthew J. Voytek, Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Sworn to before me and signed in my
presence and/or by reliable electronic means.

Kimberly A. Jolson
United States Magistrate Judge

21

## ATTACHMENT A

## Places to Be Searched

The **SUBJECT PREMISES** are further described as a residence located at 478 Allenby Drive Marysville, Ohio.  The **SUBJECT PREMISES** include a single story, townhome located approximately 1 mile northeast of the intersection of U.S. 36 and U.S. 33, within Union County, Ohio. The residence itself has a red-brick and yellow-vinyl siding front and cement front porch enclosed by a white privacy fence. The numbers "478" are affixed near the front door of the residence. The townhome shares a wall with an adjacent townhome. This warrant authorizes the search of the residence, any vehicles on the property, and any sheds or out-buildings.  A photo of the **SUBJECT PREMISES** is depicted below:



**ATTACHMENT B**

**Items to Be Seized**

1. Any evidence or information related to the **TARGET OFFENSES** articulated in the Affidavit in support of the Search Warrant Application.

2. Any evidence or information related to the identity of potential co-conspirators regarding the **TARGET OFFENSES**.

3. Firearms, firearm parts, and accessories.

4. Illicit narcotics and narcotics trafficking paraphernalia to include scales, blenders, and narcotics packaging material.

5. Cash, currency, jewelry, currency counters, financial instruments, and records relating to controlled substances, expenditure of proceeds of drug transactions, fraud, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in drug trafficking.

6. Bank and other financial institution records consisting of savings, loans, records of deposits, statements, letters of credit, money orders, cashier checks, passbooks, cancelled checks, certificates of deposit, lease agreements, customer account information, income and expense summaries, cash disbursement journals, financial statements, state and federal income tax returns, information related to the receipt and other disposition of income, and related financial information pertaining to the purchase, lease, sale or other disposition of real or personal property, including real estate, automobiles, jewelry, and furniture.

7. Electronic equipment, including but not limited to electronic media (computers, thumb drives, floppy disk, disks etc), and any stored electronic data and/or communications contained therein.

8. Cellular telephone(s) and/or portable cellular telephone(s) and any stored electronic data and/or communications contained therein.

9. Any indicia of occupancy, residency, rental, ownership, or dominion and control of the **SUBJECT PREMISES**, including any vehicles located thereon, including but not limited to state identification cards, drivers' licenses, bills, receipts for rent, cancelled envelopes, keys, deeds, purchase or lease agreements, land contracts, titles, vehicle registrations, or photographs.

10. The opening, search and removal, if necessary, of any safe or locked receptacle or compartment, as some or all of the property heretofore may be maintained.

11. Any other items which constitute evidence of the **TARGET OFFENSES** identified above.